IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | |
|---|---|
| JACOB MEINERT and NICHOLAS SCHALLUS, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PORT AUTHORITY OF ALLEGHENY COUNTY, d/b/a PITTSBURGH REGIONAL TRANSIT,<br><br>Defendant. | Case No. 2:22-cv-01736-RJC<br><br>Judge Colville |

**DEFENDANT'S BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Port Authority of Allegheny County d/b/a Pittsburgh Regional Transit ("PRT") submits the following brief in opposition to Plaintiffs' Motion to Certify a Class Action.

## Introduction

Plaintiffs seek to have certified two classes: one under Title VII for religious discrimination and one under the ADA for failure to accommodate a disability.[1] Plaintiffs' request to certify a Title VII class should be denied because the facts on which each person's claim of religious discrimination and Defendant's undue hardship defense are based are individualized and not susceptible to common proof. As to the proposed ADA class, there are only 12 putative members, whose claims can readily be joined, so the numerosity element of Rule 23 cannot be met. The ADA claims also raise issues which are not susceptible to common proof.

---

[1] Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq*. ("Title VII"); Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq*. ("ADA"). Plaintiffs' claims under the Pennsylvania Human Relations Act, 43 P.S. §§951, *et seq.*, will not be separately addressed because the legal issues and resolutions are the same as under the federal statutes.

## STATEMENT OF THE RELEVANT FACTS[2]

***Pittsburgh Regional Transit***[3]***.***  PRT is a Pennsylvania Commonwealth agency that provides public transportation services in Pittsburgh and Allegheny County.  It has approximately 2,600 employees who operate, maintain, and support bus, light rail, incline, and contracted paratransit services.  Cetra Decl. ¶ 4.

PRT operates more than 720 buses that run 365 days per year, roughly 20 hours per day, with an annual ridership in excess of 20 million.  The agency also operates more than 80 light rail cars with a ridership of about 1.4 million.  It also sponsors paratransit services for door-to-door transportation of disabled and elderly passengers and clients of social service agencies, which provide about 1.5 million rides annually.  PRT owns two funicular lines (known as "inclines"), which have an annual ridership of more than 200,000.  *Id.* ¶ 6.  PRT has its own police force comprised of about 50 employees and equips them with the necessary vehicles to provide public safety and security services covering PRT's entire geographic footprint.  *Id.* ¶ 8.

PRT maintains 27 railway stations, more than 100 light rail stops, more than 50 park and ride lots and associated facilities, 15 bus stations, about 7,000 bus stops and associated facilities, and three exclusive busways, as well as stations and tracks for the inclines.  Aside from those direct-service facilities, PRT also has ten substantial physical plants that include garages,

---

[2] Plaintiffs filed 54 identical statements, called "Declarations," which fail to state that the facts are true "under penalty of perjury."  The statements cannot, therefore, be used in place of affidavits pursuant to 28 U.S.C. §1746, and they cannot be considered by the court to decide the pending Motion for Class Certification.  *Fowle v. C&C Cola*, 866 F.2d 59, 67 (3d Cir. 1989).  Moreover, the statements filed for religious and disability plaintiffs are identical, such that none can be true.  For example, Plaintiff Schallus, whose medical exemption was denied because he did not show the vaccine was contraindicated, states that "I was told or led to believe that Defendant believed the sincerity and validity of my sincerely held religious beliefs against the Covid-19 vaccine."

[3] The facts recited in the Brief are, except as otherwise noted, substantiated by the Declaration of Michael J. Cetra and documentation authenticated by him or filed by Plaintiffs.  The Declaration will be cited as: "Cetra Decl. ¶___."

maintenance shops, heavy repair shops, offices, and other locations where support services are provided. Eight of those ten locations house or serve as a base of operations for hundreds of employees each (on average, more than 300 employees each). *Id*. ¶ 9.

***Adoption of the Mandatory Vaccination Policy.*** With the availability of COVID vaccines emerging in late 2020 and early 2021, PRT adopted a policy of strongly encouraging employees to receive a vaccine. However, due in part to the fact that none of the available vaccines had yet received full approval by the Food and Drug Administration ("FDA"), PRT did not mandate the vaccine for employees at that time. During that period, however, PRT took steps to incentivize employees to be vaccinated, including monetary incentives, and required employees to report to PRT whether they had been vaccinated. *Id*. ¶ 13. Despite those and many other efforts to increase employee vaccinations, an insufficient number received the vaccine under the voluntary policy.

Consequently, after receiving notice of the FDA's full approval of the Pfizer COVID vaccine in late August 2021, and in anticipation of the FDA's full approval of the other two principal COVID vaccines (Moderna and Janssen) later that fall or winter, PRT undertook to reevaluate its policy regarding COVID vaccines for employees. *Id.* ¶ 14. On February 1, 2022, PRT adopted a COVID-19 Mandatory Vaccination Policy ("Policy") applicable to all of its employees. The Policy required all PRT employees to become fully vaccinated against COVID-19, or to obtain an approved medical or religious exemption from the vaccination requirement, by March 15, 2022. *Id*. ¶18. *See Id*. Exh. A (the Policy) and B (Employee announcement).

***Exemption Process.*** The new policy included detailed forms, instructions, and procedures for employees to seek a disability or religious exemption. If an exemption was granted, the exempted employee was required to undergo weekly COVID testing and reporting of the results, continuous masking, and physical distancing at all feasible times while at work. *Id*. ¶ 19. PRT assembled an Accommodation Review Committee to handle the review, assessment, initial and

final decisions, and the interactive process for resolving employee requests for religious or medical exemptions. PRT also assigned internal and outside subject matter experts to provide consultation and advice for the Review Committee as it carried out its duties. *Id.* ¶20.[4]

Each member of the Review Committee received paper and electronic binders containing all of the exemption requests submitted by employees. They were organized by division and type of request and included lists and indices to enable each member individually, but also the entire Committee working together, to quickly find and assess requests by any individual. These materials also enabled the Committee to easily compare requests and Committee decisions to action it had taken with other similarly situated employees. *Id.* ¶ 40. The Committee met in person as a whole to individually review, assess, and decide the bulk of the requests that were submitted. The remaining requests, which rolled in over the ensuing weeks and months, also received individual review and assessment by the entire Committee and the pertinent consultants assisting the Committee, but that was done remotely as the new requests were received. *Id*. ¶ 42

Each employee who submitted a request received a letter informing him or her of the initial decision regarding the request. In the case of employees whose requests were initially denied, these letters also instructed the employee about his or her rights to appeal the decision or to submit additional information or materials to supplement the previous request. *Id.* ¶ 43.

During the weeks and months that followed the initial decisions, the Committee engaged in an interactive process with requesting employees, by email and regular mail, phone, and in-person meetings to address the questions and concerns of the requesting employees, and to consider additional information or materials they submitted to the Committee. This interaction

---

[4] The Policy allowed employees two weeks to submit exemption requests, and it provided forms and detailed instructions for doing so. However, as a practical matter, PRT never enforced the deadline against anyone. PRT continued to accept new exemption requests, as well as appeals and supplemental materials, for as long as employees continued to submit them. *Id.* ¶ 37.

involved many hundreds of emails and phone calls by PRT officials internally and with requesting employees. In addition, counsel for PRT had extensive communications with legal counsel for individual employees regarding their requests for exemption, the Committee's initial decisions, and the employees' appeals and supplementation of their initial requests. *Id.* ¶45-46

Finally, for every person whose request was denied, PRT met with them individually and with their union representatives as applicable, to discuss the exemption request, the denial of the request, and whether there was any way to avoid disciplinary action that PRT very much wanted to avoid. PRT scheduled and attended almost 500 individual in-person meetings, even though employees failed to appear for many of them and gave no notice of not intending to appear. *Id.* ¶ 48-49. Prior to every such meeting, the employee was encouraged to bring additional materials and information he or she wanted PRT to consider. At every meeting in which an employee did that, regardless of whether the additional information was duplicative, the managers adjourned the meeting to give the Review Committee an opportunity to consider the additional information and to reconsider its previous decision on the exemption request. *Id.* ¶ 50.

After implementation of the Policy, PRT received 358 requests for exemption, of which 303 sought a religious exemption. The Review Committee granted 43 exemptions, of which 30 were religious and 13 were medical. The Committee denied 287 requests, with the rest of the requests terminating without a grant or denial, because, for example, they became moot when the employees decided to get the vaccine. Only 12 employees whose medical exemption requests were denied declined vaccination and were terminated. *Id.* ¶ 65.

In deciding whether an exemption could be granted without undue hardship, the Committee's primary considerations were the job duties and location of the applicants. Those factors determined the exposure of unvaccinated employees to other employees and to the public. The number of employees in the same jobs and locations who had applied for an exemption was

5

also a factor because the greater the number of unvaccinated employees interacting with vaccinated employees and the public, the greater the danger to both. The nature and location of the job also determined the feasibility of implementing and monitoring compliance with the accommodations, which included weekly testing, masking, and social distancing. *Id*. ¶¶ 51-56.

PRT received exemption requests from employees in 70 different jobs (2 jobs in the Communications Division, 4 in Finance & Strategy, 3 in Human Resources, 5 in Information Technology, 6 in Legal & Corporate Services, 1 in Planning & Engineering, 24 in Maintenance, and 25 jobs in Transportation). The job with the most requests, by far, was Operator, which includes Bus and Train Operators. *See Id*. ¶¶ 64-65, Exhibits C and D.

There were 94 employees who applied for an exemption which was denied and who were discharged because they were not vaccinated. *Id*. ¶ 79. These 94 would be the persons described in Plaintiffs' class definitions. These persons were in 25 different jobs, 6 different divisions, 26 different departments, and 11 locations. Moreover, even within the Transportation Division, they were in 10 different departments and in the Maintenance Division they were in another 10 departments. They were in 2 departments in the Legal Division, 1 department within Information Technology, 2 departments in Finance & Strategy, and 1 department in Communications. *Id*. ¶¶ 82, Exh. J. Of the 94, 12 submitted requests for medical exemption, 82 submitted requests for religious exemption, and included in those numbers are 10 who submitted requests for both religious and medical exemptions. *Id*. ¶83.

Given the volume of religious exemption requests, the Committee did not challenge or evaluate the sincerity or religiosity of the applicants' reasons for requesting an exemption. PRT did not, however, concede either point. *Id*. ¶ 67-68. Indeed, even while Meinert's request for an exemption was still pending, his attorney, James Welsh, was expressly informed that PRT was not waiving its right to require him to prove both sincerity and religiosity of his beliefs, were his claim

6

to progress to litigation. ECF Doc. 53-1, Declaration of William Myers ¶3, Exh. 2.[5]

**Meinert and Shallus Exemption Requests.** Jacob Meinert was a PRT employee who requested an exemption on February 2, 2022, because of an alleged religious objection to the COVID-19 vaccine. He was a Bus Assignment Shifter in the Maintenance Division of PRT, assigned to the East Liberty Garage. The East Liberty Garage is PRT's largest and busiest bus facility, and at the time had more than 480 employees. His request was denied initially in a letter dated February 25, 2022. Meinert appealed and submitted a letter from his church. He provided another letter on March 9, 2022. After further consideration, he was again informed of the denial in an email dated March 19, 2022, and again after a hearing on May 3, 2022 at which he again provided no additional information. *Id*. ¶¶ 69-70, Exhs. E, F, and G.

Meinert's request was denied because granting it would have caused an undue hardship. The denial was based mainly upon a review conducted by a multi-function exemption review committee that included PRT's Maintenance Division Chief. It included an assessment of various aspects of Meinert's job, including the regular traffic in and through Meinert's work station, the substantial amount of time during a shift that he would spend moving throughout the East Liberty Garage and otherwise interacting with employees in person and in close proximity, the fact that the Shifter's work station had been a hot spot for COVID outbreaks, and the high volume of accommodation requests for Maintenance Department employees. Cetra Decl. ¶¶ 71-72.

PRT concluded that allowing an exemption for Meinert and similarly-situated employees would pose an undue hardship. That included the health risks to Meinert and other employees, as well as the extraordinary difficulty of monitoring and enforcing the conditions required for an

---

[5] There is a motion for partial summary judgment pending in which Plaintiff has asked for a ruling that none of the Plaintiffs or the class members need to establish either the sincerity or religiosity of their opposition to the vaccine. Defendant filed a response opposing this motion.

7

exemption among that many employees (principally, weekly testing and reporting, proper masking, and consistent social distancing),  This was made even more burdensome, by the right of employees under the applicable collective bargaining agreement to move to different jobs and even facilities at least once a year based on seniority.  *Id*. ¶ 73.

Nicholas Schallus was a Bus Operator in PRT's Transportation Division, assigned to PRT's West Mifflin Garage.  He submitted a request for a medical exemption on February 8, 2022, citing a generalized history of "severe allergic reactions" and accompanied by a letter from a physician that referred to "multiple food and drug allergies."  None of the materials submitted specified the allergies or their relation to any COVID vaccines available to the public at that time.  *Id*. ¶ 74

In its initial review of this request, the Committee consulted Michael R. Owens, M.D., an outside medical expert retained through UPMC WorkPartners, for advice on the request and its underlying condition.  Dr. Owens reviewed the entire exemption request, including the letter from his physician, and advised that the condition described by Schallus and his physician was not recognized as a contraindication for receiving a COVID vaccine.  *Id*. ¶¶ 75-76.

Rather than deny the exemption request outright, the Review Committee sent a letter to Schallus asking for more information about his condition, and specifically noting the need to show it was a contraindication for a COVID-19 vaccine.  Schallus submitted additional information from the same physician, but on further consultation by the Committee, Dr. Owens advised Committee members in an email dated March 4, 2022, that the exemption request should be denied because the Centers for Disease Control recommends COVID vaccination for people with a history of severe allergic reactions unrelated to vaccines or injectable medications.  *Id*. ¶¶ 76-77, Exh. H.

Following further interaction with the Review Committee, including a meeting on April 19, 2022, Schallus again submitted medical information.  Again, the Review Committee consulted

with Dr. Owens on the new submission. Dr. Owens promptly reviewed the additional information, and offered the following advice in an email dated April 20, 2022:

> I have reviewed the additional information submitted in support of N. Schallus' COVID-19 vaccination exemption request. Based upon that information and current CDC guidance, I recommend that the request be denied. The documentation does not support the presence of a contraindication to vaccination. According to CDC, "CDC recommends that people get vaccinated even if they have a history of severe allergic reactions not related to vaccines or injectable medications—such as food, pet, venom, environmental, or latex allergies. People with a history of allergies to oral medications or a family history of severe allergic reactions may also get vaccinated."

*Id.* ¶ 78, Exh. I. Shallus' exemption was denied because it was not medically supported.[6]

## ARGUMENT

### A. *General Class Action Principles*

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks omitted). To justify this exception to the rule, "every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N.A., LLC*, 687 F.3d 583, 590 (3d Cir. 2012). In order to satisfy Rule 23(a), a plaintiff must show:

> (1) the class must be so numerous that joinder of all members is impracticable (numerosity); (2) there must be questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class (typicality); and (4) the named plaintiffs must fairly and adequately protect the interests of the class (adequacy of representation, or simply adequacy).

*In re Community Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) (internal quotations marks

---

[6] The substantial interaction and repeated submissions by Schallus demonstrate that the statement in his "Declaration" that he was not given a reason for his exemption denial or was told it was due to undue hardship is obviously false. ECF Doc No. 73-3 ¶ 3.

9

omitted). Further, if those requirements are met, Rule 23(b)(3), which is the basis for certification here, "requires that (i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)." *Marcus, supra,* 687 F.3d at 591.

The party seeking certification bears the burden of establishing each required element of Rule 23 by a preponderance of the evidence. *Id*.; *In re Modafinil Antitrust Litigation*, 837 F.3d 238, 248 (3d Cir. 2016). PRT submits that Plaintiffs cannot establish the elements required for class certification of either of their proposed classes, regardless of how defined.

**B.     *Plaintiff's Proposed Classes***

Plaintiffs have described their proposed class or classes differently in various court papers in this action,[7] but the Proposed Order accompanying the present motion offers this formulation:

> 1)   All Plaintiffs who submitted a religious exemption that was denied and terminated based upon undue hardship where Plaintiff was terminated or otherwise suffered an adverse employment consequence.
>
> 2)   All Plaintiffs who submitted a medical exemption that was denied due to not having a contraindication to the CDC guidelines where Plaintiff was terminated or otherwise suffered an adverse employment consequence.

Regardless of the description, none of Plaintiffs' formulations meets the standard for certification, but the above is their most recent, so Defendant will address it specifically here.

**C.     *Plaintiffs' Proposed Medical Exemption Class Lacks Numerosity.***

Plaintiffs have asked for certification of a class consisting of former employees who requested an exemption as an accommodation for a disability, were denied an exemption, and then discharged. There are only 12 individuals who fit this description, including named Plaintiff

---

[7] For instance, Paragraph 106 of the Third Amended Complaint describes the desired class differently from the Proposed Order for this motion, and Plaintiffs' brief in support of the present motion, at p. 3, offers yet another, slightly different, formulation.

Nicholas Schallus.  Cetra Decl. ¶ 66.

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable."  This is commonly referred to as the "numerosity" requirement.  *In re Modafinil, supra,* at 249.  In that case, the court stated the following guidelines for numerosity:

> While no minimum number of plaintiffs is required to maintain a suit as a class action, our Court has said that generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.  At the other end of the spectrum, the Supreme Court has stated in *dicta* that a class of fifteen was too small to meet the numerosity requirement.  Leading treatises have collected cases and recognized the general rule that a class of 20 or fewer is usually insufficiently numerous[,] a class of 41 or more is usually sufficiently numerous[,] while classes with between 21 and 40 members are given varying treatment.  These midsized classes may or may not meet the numerosity requirement depending on the circumstances of each particular case.

*Id*. at 249-50 (citations and quotation marks omitted).  While there is no absolute floor on numerosity, our research found no case in this Circuit in which a class of 12 members was certified.

It is Plaintiffs' burden to show why joinder is not practicable.  *Marcus, supra*, at 591; *Modafinil, supra*, at 259 ("The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence," including numerosity).  Plaintiffs' brief does not even address numerosity, other than to discuss the alleged impracticability of individual lawsuits.  Plaintiffs' Brief at 18.  However, the Third Circuit made clear in *Modafinil* that this is not a proper consideration.  *Id*. at 258 ("the numerosity rule does not envision the alternative of individual suits; it considers only the alternative of joinder").  Plaintiffs made no attempt to show that joinder of 12 claims is not practicable.

The Court should decline to certify a class consisting of medical exemption requesters.[8]

---

[8] In any case, the need to prove that each class member was "a qualified individual with a disability" would preclude class treatment because of the inherently individualized nature of the inquiry.  *Hohider v. United Parcel Service, Inc*., 574 F.3d 169, 185-86 (3d Cir. 2009).  *See*

11

### D.      Plaintiffs' Proposed Title VII Class Should Not Be Certified

A trial court must perform a "rigorous analysis" to ensure the requirements of Rule 23(a) are satisfied. *Walmart Stores v. Dukes, supra*, at 350-51; *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Under Rule 23(a)(2), the plaintiffs must show "there are questions of law or fact common to the class." To show this, the class claims "must depend on a common contention" that "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Walmart Stores v. Dukes, supra*, at 350. A common *question* alone does not satisfy commonality. Rather, "[w]hat matters to class certification … is … the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id* (emphasis added) (internal quotation marks omitted).

In the present case, there is no disputed issue that is capable of resolution for the entire class "in one stroke." There are two disputed issues on liability. The first is whether the Plaintiffs "held a sincere religious belief that conflicted with a job requirement." *Fallon v. Mercy Catholic Med. Ctr.*, 877 F.3d 487, 490 (3d Cir. 2017).[9] The second is whether PRT can show it "was unable to reasonably accommodate [Plaintiffs'] religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Neither issue, despite Plaintiffs' efforts to gloss over it, is susceptible to common proof.

---

*O'Hailpin v. Hawaiian Airlines, Inc.*, 2023 WL 8600498 at **13-25 (D. Haw. Dec. 12, 2023). Also, the issue of whether allowing an unvaccinated employee to work would pose a "direct threat" is dependent on the particulars of the job and also not susceptible to common proof. *See Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp.3d 412, 430 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022).

[9] As noted above, Plaintiffs have filed a Motion contesting whether Plaintiff Meinert and the class members must establish this element of their claims. Defendant has opposed that motion, which is nearly verbatim to a motion rejected by the district court in *Gallo v. Washington Nationals Baseall Club, LLC*, 2024 WL 1810621 at *4 (D.D.C. 2024).

The issue of whether a plaintiff has a belief that is both sincerely held and religious is a quintessentially individual issue. It involves a personal matter which cannot be resolved on a classwide basis, and courts have refused to certify a class that required common proof of this issue.

In *O'Hailpin v. Hawaiian Airlines Inc.,* 2023 WL 8600498 (D. Haw. Dec. 12, 2023) the district court rejected class certification on claims that the employer violated Title VII and the ADA by refusing the plaintiffs' requested medical or religious exemptions from a COVID vaccine policy. On the commonality issue, the court held that the sincerity of an employee's religious beliefs requires individualized consideration:

> So although an employer's ability to question the line between sincerely held belief and secular preference may be limited, it nonetheless exists. And the Court agrees with Hawaiian that probing that distinction … necessarily involves individualized inquiries that are not susceptible to common proof. See EEOC Compliance Manual § 12(A)(1) (explaining that deciding whether a belief or practice is religious requires a 'case-by-case inquiry").

Id. at *10. The Court also found the issue of whether the defendant could establish undue hardship required individualized consideration, also making class treatment unavailable. *Id.* at **11-13.

In *Chavez v. San Francisco Bay Area Rapid Transit District*, 2024 WL 332881 (N.D. Cal. Jan. 28, 2024), the plaintiffs also alleged a violation of Title VII and the ADA when their religious and medical exemption requests were denied under a COVID vaccine policy. As in the present case, the *Chavez* employer did not challenge religiosity or sincerity for any religious exemption requests, but denied them on the ground of undue hardship. The Court denied class certification under both statutes, holding with respect to sincerity and religiosity:

> Whether or not any one request rests on a bona fide religious belief presents an individual inquiry that requires the consideration of evidence pertaining only to the response in question. It is doubtful that the various written and interview responses of plaintiff Chavez, for example, will have any evidentiary value as to the bona fide religious belief of the class as a whole, or that any one class member will be able to make the necessary showing via common proof … .

13

*Id*. at *4. The Court also held that the undue hardship defense required an individualized showing:

> BART's undue hardship showing—likely to be the dispositive issue in this action—also rests on individual factual issues. … The vocational diversity of plaintiffs' proposed class breaks common issues into a variety of individual factual inquiries, defeating predominance.

*Id.* at *5. The court noted the "large diversity of jobs" the plaintiffs held, reasoning:

> For example, accommodations reasonably considered in the context of a train conductor's request bear no relation to the job functions and reasonable accommodations BART must consider when evaluating the exemption request of a manager of technology programs, or a fire protection worker, or a police officer or a senior operations supervisor liaison."

*Id.* The court also noted that "determining the universe of reasonable accommodations for a non-union position such as manager of technology programs will not resolve the universe of accommodations available to a potential class member whose employment is governed by [a union agreement]." *Id.* Finally, the court held that the superiority requirement of Rule 23(b)(3) could not be satisfied, essentially for the same reasons.

In *Speer v. Ucor LLC*, 2023 WL 7305037 (E.D. Tenn. Nov. 6, 2023), the court addressed a motion to certify a class action in a mandatory COVID vaccination context. The Court denied certification. In discussing the elements of Rule 23(b)(3), the Court stated:

> The two central questions in this case are therefore: (1) whether each employee's objections to Defendant's vaccine requirement were based on their sincerely held religious beliefs and (2) whether an accommodation could be granted to each employee without undue hardship. These are inherently individualized questions which will predominate over any shared issues.

*Id.* at 17. On the issue of undue hardship, the district court concluded that "What it means for an accommodation to be 'reasonable' and for a hardship to be 'undue,' is an inherently individualized analysis which depends on the duties and responsibilities of each employee." *Id.* at * 21.

Judge Horan's opinion in *Chesher v. Allegheny County*, 2023 WL 6214243 (W.D. Pa. Sept. 25, 2023) is instructive. Judge Horan held that the plaintiffs' claims of religious discrimination arising out of Allegheny County's mandatory vaccination policy, had to be severed because of the individualized nature of claims of religious discrimination:

> The individuality of each Plaintiff's factual circumstances is particularly relevant to the Title VII of the Civil Rights Act of 1964 religious discrimination claims. The allegations of each Plaintiff includes separate and distinct religious beliefs. Assessing each of these requires separate inquiries into the sincerity of any alleged religious belief, the nature of each individual Plaintiffs' job, and the reasonableness of any accommodation requested.
>
> Next, Plaintiffs are all employed in various jobs within Allegheny County and are members of various organized labor associations that operate under different collective bargaining agreements. Plaintiffs have jobs in eight different departments within Allegheny County. As a result, individual Plaintiffs experienced uncommon interactive processes and individuals when discussing possible religious and/or medical based on their departments.

*Id*. at \*\*2-3 (record citations omitted).

Plaintiffs cite EEOC guidance for the proposition that religious beliefs are to be presumed. Plaintiffs' Brief at 6. Obviously, that is not an accurate statement of the law, as all formulations of a plaintiff's *prima facie* case under Title VII require a plaintiff to establish a sincerely held religious belief. *E.g.*, *Fallon v. Mercy Catholic Med. Ctr.*, 877 F.3d 487, 490 (3d Cir. 2017) ("to establish religious discrimination" the employee must show that "he held a sincere religious belief that conflicted with a job requirement."); *Blackwell v. Lehigh Valley Health Network*, 2023 WL 362392 at \*4 (E.D. Pa. Jan 23, 2023). It is never presumed.[10]

Plaintiffs have cited no cases certifying a class action where a disputed issue involved the

---

[10] Also, contrary to Plaintiffs' assertion, the EEOC Compliance Manual makes it clear that "Whether the practice is religious is therefore a situational, case-by-case inquiry, focusing not on what the activity is but on whether the employee's participation in the activity is pursuant to a religious belief." EEOC Compliance Manual § 12A.1.

sincerity of Plaintiffs' religious beliefs or an issue of undue hardship.  Instead, Plaintiffs rely their contention that PRT may not dispute the sincerity and religiosity of their beliefs.  *See* Plaintiffs' Brief at 6.  Defendant fully briefed that issue in its opposition to Plaintiff's Motion for Partial Summary Judgment.  Moreover, the identical argument in an identical context was rejected by the court in *Gallo v. Washington Nationals Baseall Club, LLC*, 2024 WL 1810621 (D.D.C. 2024).

With respect to undue hardship, Plaintiffs assert that "Defendant admits that it did no individualized analysis to determine undue hardship," citing Meinert's unsworn statement that "I was told or led to believe that Defendant believed the sincerity and validity of my sincerely held religious beliefs."  Plaintiffs' Brief at 7, Exh. 3.[11]  First, that is unsworn; second, it is not a PRT admission; and third, it is patently false.  The documentary evidence and Declaration of Michael Cetra make it clear the issue of undue hardship was job dependent and carefully reviewed for each exemption request.  Moreover, the fact that PRT granted exemptions to 43 employees demonstrates that decisions were individual, not rubber stamped, as falsely contended by Plaintiffs.

Plaintiffs list 8 purported "common questions of fact" and 9 purported "common questions of law," most of which focus on the standardized nature of the exemption process.  Plaintiffs' Brief at 10-11.  However, whether the exemption review process followed consistent protocols, with common forms and procedures, does not resolve, or even relate to, the putative class claims.  What matters for this motion is the dispositive questions of sincere religious belief and accommodation were analyzed individually by PRT and must also be separately considered by a trier of fact.

Plaintiffs' argument goes astray by assuming that because the same questions must be answered in each Plaintiff's case, that shows commonality, which is incorrect.  A common question alone does not satisfy the commonality requirement.  Rather, "[w]hat matters to class

---

[11] Schallus makes the identical statement, even though he did not make a religious exemption request.  His statement in this regard is obviously false.  See Exhibit 3, second statement.

certification … is … the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-mart Stores v. Dukes, supra*, at 350.  Plaintiffs do not identify a single issue pertaining to liability that can be determined on a class-wide basis.

Plaintiffs' predominance arguments under Rule 23(b)(3) suffer from the same flaws as their commonality arguments under Rule 23(a).  Under Rule 23(b)(3), "questions of law or fact common to class members predominate over any questions affecting only individual members."  *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 452 (2016).  Plaintiffs ignore this issue, which is "far more demanding" than the commonality requirement of Rule 23(a)(2).  *Windsor*, 521 U.S. at 623-24; *see also Comcast Corp. v. Behrend*, 569 U.S.27, 34 (2013) ("If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a).").  Given the decisions reviewed above under Rule 23(a), it is clear that Rule 23(b) predominance is lacking.

**E.     Conclusion**

For the foregoing reasons, PRT respectfully submits Plaintiffs' Motion for Certification of a Class Action should be denied.

Respectfully submitted this 20th day of May 2024.

*/s/ John J. Myers*
John J. Myers (Pa. ID 23596)
William S. Myers (Pa. ID 38565)

Eckert, Seamans, Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, Pennsylvania 15219
412-566-5900/412-566-1938 (telephone)
jmyers@eckertseamans.com
wmyers@eckertseamans.com

Attorneys for Defendant